**In re BOULDERS ON THE RIVER, INC., an Arizona corporation, Debtor.**

**PACIFIC FIRST BANK, through its assignee RT CAPITAL CORPORATION, Appellant,**

v.

**BOULDERS ON THE RIVER, INC.; Peter Hrebec III; James Miller; Hrebec Management; Hrebec Properties, Inc., and City of Eugene, Appellees.**

BAP No. OR–93–1676–AsMeO.

Bankruptcy No. 692–64208–R11.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Jan. 20, 1994.

Decided Feb. 28, 1994.

James C. Lancaster, Portland, OR, for appellant.

Wilson C. Mulheim, Carolyn G. Wade, Eugene, OR, for appellees.

Before ASHLAND, MEYERS and OLLASON, Bankruptcy Judges.

## OPINION

ASHLAND, Bankruptcy Judge:

The debtor proposed a plan of reorganization that restructured the construction loan of the largest secured creditor into permanent financing. The plan paid the note on a 25 year amortization schedule with a balloon payment due at the end of the seventh year. The bankruptcy court found that the plan was proposed in good faith and satisfied the fair and equitable standards under 11 U.S.C. § 1129. We affirm.

### STATEMENT OF THE FACTS

The facts are not in dispute. The debtor Boulders on the River, Inc. ("Boulders"), is an Arizona corporation. Boulders' principal business is the ownership and operation of a 248–unit apartment complex located in Eugene, Oregon. Peter Hrebec III and James J. Miller are the sole shareholders, directors and officers of Boulders. Hrebec owns 51% and Miller owns 49% of the stock in Boulders.

Boulders acquired the real property underlying the Boulders apartments in September 1988 for $695,604. In early 1989, Boulders began negotiating terms for a construction loan with two related banks, First Interstate Bank of California and First Interstate Mortgage Company. However, the financing package with First Interstate did not materialize. Hrebec, Miller, and Boulders subsequently sued First Interstate in the Federal District Court for the District of Oregon for damages arising out of the failed financing. Plaintiffs sought over $8 million in compensatory damages and several million dollars in punitive damages. Boulders and First Interstate are currently in settlement negotiations. No trial date has been set.

In March 1990, Boulders eventually obtained construction financing from Pacific First Bank ("Pacific"). Boulders executed and delivered a note to Pacific in the amount of $10,100,000. Boulders was obligated to repay the loan in 18 months, with the option of extending the maturity date for two, six month periods if Boulders met certain conditions. The Boulders note was secured by a deed of trust on the Boulders property that included an assignment of rents.

In June 1990, Pacific lent $10,650,000 to another corporation owned by Hrebec and Miller known as Trails at Mt. Scott, Inc. The proceeds from the Trails loan were to fund construction of an apartment complex on property owned by Trails at Mt. Scott, Inc. The Trails loan is secured by the Trails property and the Boulders property.

In early fall 1990, after approximately $1,300,000 of the Trails loan had been disbursed, Hrebec and Miller elected not to proceed with the Trails project and requested a modification of the loan. Pacific agreed to modify the terms of the loan by: (1) reducing the principal balance of the Trails loan to $1,500,000; and (2) permitting Boulders to draw $300,000 in undisbursed loan proceeds from the Boulders loan to pay for expenses associated with the Trails property. In sum, the Boulders property is secured by a first deed of trust in the amount of $10,100,000 which secures the Boulders note and a second deed of trust in the amount of $1,500,000 which secures the Trails note.

Shortly thereafter, the Boulders property began encountering problems. The Boulders property neglected to lease-up its units according to projections. By the end of May 1991, the Boulders property had been able to lease only one-third of its units and Boulders was in default under the loan agreement.

Nevertheless, Pacific agreed to modify the terms of the loan extending the maturity date from April 30, 1991 to November 1, 1991.

Boulders subsequently failed to meet the occupancy level standards, the minimum cash flow requirements, and the maturity dates under the modified loan agreement. Pacific worked with Boulders and agreed to a third modification effective April 7, 1992. However, Boulders defaulted on the terms of the third modification by failing to make payments due in May and June 1992.

Boulders filed for protection under Chapter 11 of the Bankruptcy Code on July 23, 1992. Trails at Mt. Scott, Inc. filed a companion case now pending in the Bankruptcy Court, District of Arizona. Trails at Mt. Scott, Inc. has submitted a plan which proposes to deed the Trails Property to Pacific for partial credit against the Trails loan with the balance to be paid by Boulders.

The Boulders plan of reorganization has eight classes that pay 100% of all the outstanding claims against the estate.[1] Three components are relevant to the subject of this appeal. First, Pacific's construction loan is converted into permanent financing by amortizing Pacific's balance over a twenty five year period, with a balloon to be paid at the end of year seven.[2] Boulders proposed a market interest rate of 8% while Pacific proposed a blended 9.3% interest rate.

Second, the plan eliminates Pacific's lien on approximately $675,000 in surplus operating funds which accumulated during the course of the bankruptcy. The operating funds were earmarked by Boulders to pay the unsecured creditors, the property taxes,

administrative expenses of the bankruptcy, debt service reserve, capital replacement reserve, miscellaneous corporate matters, and $100,000 to pay the legal fees associated with the First Interstate lender liability litigation. Pursuant to a Cost and Recovery Sharing Agreement, Boulders is responsible to pay 33.49% of the costs associated with the First Interstate litigation and is similarly entitled to 33.49% of any recovery. The plan does not allocate the potential proceeds from the judgment to pay its creditors.

Third, the plan authorizes Boulders to pay 100% of the $2,320,000 related party unsecured claims of Hrebec and Miller at a 7% interest rate. The related party claims are due in full on the same date that Pacific's claim is due in full.

After three days of hearings on the Boulders plan of reorganization, the bankruptcy court delivered its findings with respect to the plan from the bench. First, the court valued the Boulders property at $15,020,000. The court made its decision after being presented with four different estimates: (1) the tax assessment of $11,000,000; (2) Pacific's assessment of $13,800,000; (3) Boulder's assessment of $15,020,000; and (4) Miller's assessment of $17,000,000.

Second, the bankruptcy court determined that Pacific was entitled to a market interest rate at 9%. The expert testimony revealed that the market supplied loans at a loan to value ratio of 70%. Under the terms of the plan, Boulders provided Pacific with an 88.5% loan to value ratio.[3] Accordingly, the bankruptcy court applied a blended interest rate to compensate Pacific for the risk of

1. Class six consists of the allowed unsecured claims. Pacific purchased the unsecured claim of EWEB for $8,265. At the confirmation hearing, Pacific admitted that it purchased the EWEB claim in order to control the unsecured class and vote not to accept the Boulders plan. A vote not to accept could have prevented confirmation of the Boulders plan. Class six may have been the only non-insider impaired class accepting the plan of reorganization. *See,* 11 U.S.C. § 1129(a)(10). EWEB agreed to reimburse Pacific in the event that the claim was found to be less than the $8,265 purchase price. The bankruptcy court ultimately valued the EWEB claim at $434.80. Pacific neglected to include the 60

pages of transcript from this hearing when designating the record. Fortunately, the appellee included the missing pages, along with several other omissions to the record, in an appendix to its brief.

2. The plan originally called for a thirty year amortization. However, Boulders agreed to reduce the amortization period to twenty five years in order to reflect the market period.

3. The 88.5% figure was calculated by dividing the $13,300,000 outstanding loan obligation due Pacific by the $15,020,000 property valuation.

lending to Boulders beyond the 70% loan to value ratio.

The court found the market interest rate to be 8.25% on the first 70% of the value of the property or $10,514,000. After subtracting $10,514,000 from the $13,300,000 debt to Pacific, the court found an interest rate of 12% applied to the remaining $2,786,000. The blended interest rate on the two preceding calculations yielded 9.04% which the court rounded down to 9%.

The bankruptcy court permitted Boulders to retain the $675,000 cash reserves because the reduction in the amortization period coupled with the 9% interest rate increased the monthly amortization to Pacific. Additionally, the court found the equity cushion in the property adequately protected Pacific's interest in recovering its debt.

Finally, the court found the plan was proposed in good faith. The court found that it is not bad faith for a plan proponent to provide for the insider creditors to recover part of their loan or investment. Similarly, the fact that Boulders was unwilling to sell the property immediately in order to pay off the bank quickly did not defeat the court's finding of good faith. This appeal followed.

## STATEMENT OF THE ISSUES

Whether the second amended plan of reorganization was proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3).

Whether the second amended plan of reorganization treated the largest secured creditor's claim fairly and equitably pursuant to 11 U.S.C. § 1129(b)(2)(A).

## STANDARD OF REVIEW

■ The bankruptcy court's finding of good faith will not be overturned unless clearly erroneous. *In re Corey*, 892 F.2d 829, 835 (9th Cir.1989), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *In re Stolrow's Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988); *see also, In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984); *In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. BAP 1986). The issue of "fair and equitable" treatment under a plan of reorganization is a question of fact that we review under the clearly erroneous

standard. *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir.1986); *Citibank v. Baer*, 651 F.2d 1341, 1346 (10th Cir.1980) (Bankruptcy Act Case); *Stolrow's*, 84 B.R. at 172. A finding of fact is clearly erroneous when after reviewing the evidence we are left with the definite and firm conviction that a mistake has been committed. *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988).

## DISCUSSION

Pacific offers two challenges to the bankruptcy court's confirmation of the Boulders plan of reorganization. Pacific maintains that the plan was not proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3) and that the plan did not treat Pacific's claim fairly and equitably pursuant to 11 U.S.C. § 1129(b)(2).

### A. *Good Faith*

■ Section 1129(a)(3) states that the bankruptcy court shall confirm a plan if the plan has been proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Initially, it is important to recognize that there is a legal distinction between the good faith that is a prerequisite to filing a Chapter 11 petition and the good faith that is required to confirm a plan of reorganization. *In re Stolrow's, Inc.*, 84 B.R. 167, 171 (9th Cir. BAP 1988); *see also, In re Madison Hotel Assocs.*, 749 F.2d 410, 424–426 (7th Cir.1984).

■ Section 1112(b) provides that a Chapter 11 petition may be dismissed for cause if it appears that the petition was not filed in good faith. *Stolrow's*, 84 B.R. at 170. Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors. *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984). The good faith that is required to confirm a plan of reorganization requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Corey*, 892 F.2d 829, 835 (9th Cir.1989), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *Stolrow's*, 84 B.R. at 172;

*In re Jorgensen,* 66 B.R. 104, 108–109 (9th Cir. BAP 1986). A bankruptcy judge is in the best position to assess good faith viewed under the totality of the circumstances. *Stolrow's,* 84 B.R. at 172; *Jorgensen,* 66 B.R. at 108–109. "The finding of good faith will not be overturned unless the opponent of the plan can show that the finding was clearly erroneous." *Stolrow's,* 84 B.R. at 172 (citing *In re Koelbl,* 751 F.2d 137, 139 (2d Cir.1984)). Pacific has not met its burden of showing that the bankruptcy court's finding of good faith was clearly erroneous.

■ Pacific attempts to identify three proposals under the plan that demonstrates the plan does not achieve the objectives of the Bankruptcy Code. First, Pacific maintains that the plan permits Boulders to wrongfully use $675,000 in cash collateral secured by Pacific's lien. During the course of the bankruptcy, Boulders was able to accumulate a surplus fund because it was not required to service Pacific's debt. Boulders earmarked the funds for distribution on confirmation to pay: (1) the unsecured creditors; (2) property taxes; (3) legal costs of bankruptcy; (4) debt service reserve; (5) capital replacement reserves; (6) miscellaneous corporate matters; and (7) the First Interstate litigation. The projected cash needs of Boulders at confirmation left $89,587 potentially available for distribution to a secured creditor, Pacific. The bankruptcy court found that the Boulders plan proposal to use the accumulated cash collateral was feasible and Boulders was entitled to use the funds because Pacific's interests were adequately protected. We agree.

A secured creditor who holds a blanket lien on the assets of the debtor has an interest in the debtor's cash collateral. The debtor may not use the cash collateral out of the ordinary course of business unless the creditor is adequately protected. *See,* 11 U.S.C. § 363(e). The Ninth Circuit implied in the context of a relief from stay motion that a 10% cushion satisfies the adequate protection standard. *See, In re Mellor,* 734 F.2d 1396, 1401 (9th Cir.1984). Given the bankruptcy

court's $15,020,000 property valuation, we find Pacific was adequately protected with a cushion of 11.45%.[4] *See, In re James Wilson Assocs.,* 965 F.2d 160, 171 (7th Cir.1992) (secured creditor has no right to fence off the entire collateral in which it has an interest, its only entitlement is to the adequate protection of its interest).

Boulders' planned use of the funds was necessary to successfully implement the plan. The cash reserve was earmarked for capital improvements and debt service. A serious deficiency in either category could have rendered the plan unfeasible. Similarly, the payment of Boulders' legal fees connected with the First Interstate litigation was prudent. Although the plan did not detail how Boulders would distribute the funds if the litigation were successful, we agree with the bankruptcy court that the litigation is nevertheless an asset of the estate and there is no reason to abandon it.

■ Second, Pacific maintains that the interest payments to Hrebec and Miller under the plan demonstrates a lack of good faith. Pacific's allegation is misplaced. The plan provides for interest only payments of 7% on the claim of Hrebec and Miller until paid in full. Hrebec and Miller lent Boulders $2,249,039 and will not receive any principal payments until Pacific is paid in full. If Pacific did not agree with the classification of the Hrebec and Miller contribution as a loan, it should have objected to the claim prior to confirmation. Section 502(a) states that a claim is allowed unless a party in interest, including a creditor, objects. 11 U.S.C. § 502(a). We find that the insider creditors made a loan to Boulders and it does not violate the principles of good faith to permit them to receive a return on their investment under the terms of the plan.

■ Third, Pacific maintains that the length of the plan and Boulders' sales efforts evidence a lack of good faith. Under the terms of the plan, Pacific is paid a monthly installment of principal and interest for seven years calculated on a twenty five year amor-

---

4. Value Cushion is calculated by taking the fair market value of the property less the outstanding debt divided by the fair market value. Here, the calculation yields $15,020,000 − $13,300,000 = $1,720,000 ÷ $15,020,000 = .114514.

tized basis. Boulders will make a balloon payment at the end of the seventh year. We do not find that the time period on Pacific's loan is an indication that the plan was proposed in bad faith. *See, In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir.1992) (approving a plan that provides for a 25 year amortization schedule with a seven year balloon payment).

Apparently, Boulders chose a seven year period in order to obtain a good price on the market. The evidence at the hearing demonstrated that a forced sale or a sale performed hastily would yield less then a market return. The fact that Boulders is trying to get the most the market yields for the property does not evidence bad faith. Similarly, the fact that Boulders was not willing to negotiate with the party making an offer to buy at $13,500,000 does not demonstrate a lack of good faith. The offer was $3,500,000 less then the asking price listed in the Boulders prospectus and $2,000,000 less than the bankruptcy court's estimation of the value of the property.

The bankruptcy court properly viewed the elements of the plan assessing the "totality of the circumstances" and determined that the plan was proposed in good faith. *See, Stolrow's*, 84 B.R. at 172. We are not left with the definite and firm conviction that the bankruptcy court's findings with respect to good faith were a mistake. *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988).

### B. *Fair and Equitable*

▮ Pacific argues that the bankruptcy court erred in confirming the Boulders plan because the plan did not treat Pacific's claim fairly and equitably. Section 1129(b)(2)(A) provides three situations where a secured creditor's treatment under the plan will be classified as fair and equitable. For the purpose of this appeal, we are concerned with the correct application of § 1129(b)(2)(A)(i). That subsection requires the plan to provide with respect to secured claims:

(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i). Pacific agrees that the Boulders plan permits them to retain the liens securing their claim. As a result, the first prong of this test has been satisfied. However, Pacific maintains that the second prong is not satisfied because the interest rate at which Pacific's claim will accrue post confirmation is too low.

The Ninth Circuit applies the "formula rate" approach for determining the interest payable on the deferred payment of an obligation under cram down. *In re Fowler*, 903 F.2d 694, 697 (9th Cir.1990); *In re El Camino Real*, 818 F.2d 1503, 1508 (9th Cir.1987). "Under this approach, the court starts with a base rate, either the prime rate or the rate on treasury obligations, and adds a factor based on the risk of default and the nature of the security (the 'risk factor')." *Fowler*, 903 F.2d at 697. Bankruptcy court's are instructed to make the interest rate determination on a case by case basis. *El Camino*, 818 F.2d at 1508.

Pacific maintained throughout the confirmation hearings and now on appeal that the interest rate should be a blended interest rate. The expert testimony at the confirmation hearings revealed that financial institutions usually lend money at a 70% loan to value ratio. To the extent that a loan is less than or equal to 70% of the value of the property securing the loan, a market interest rate will prevail. However, to the extent that the loan exceeds 70% of the value, the lender is exposed to additional risk and should therefore be compensated by a corresponding increase in the interest rate. The bankruptcy court adopted Pacific's blended interest rate analysis finding an 8.25% interest rate applicable to the funds up to a 70% loan to value ratio and a 12% interest rate for funds in excess of the 70% loan to value ratio.

Pacific agrees with the bankruptcy court's blended interest rate calculation and the interest rates applied by the court. However, Pacific disagrees with the bankruptcy court's property valuation. Pacific maintains that the bankruptcy court erred in estimating the value of the Boulders property and therefore erred in estimating the blended interest rate.

The bankruptcy court found the Boulders property to have an estimated value of $15,020,000. This valuation produced a 9.035% blended rate which the court rounded down to 9%.[5] Pacific maintains that the property is worth $13,800,000 which produces a blended rate of 9.3%.[6]

The determination of a property's value is a factual finding. *In re Tuma*, 916 F.2d 488, 491 (9th Cir.1990). We review findings of fact under a clearly erroneous standard. Federal Rule of Bankruptcy Procedure 8013. A finding of fact is clearly erroneous when after reviewing the evidence we are left with the definite and firm conviction that a mistake has been committed. *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988).

The bankruptcy court heard three days of testimony concerning the appraisals of the property and the corresponding interest rates. Ultimately, the court had four estimates to choose from: (1) the property tax assessment of approximately $11 million; (2) Pacific's assessment of $13.8 million; (3) Boulders' revised assessment of $15.02 million; and (4) Miller's assessment of $17 million. The court acknowledged that it reviewed all the evidence and found the most

reliable evidence to be that espoused by Boulders.

Similarly, we have reviewed the various appraisals. Although we may have each independently chosen one of the other appraisals, we are not convinced that the bankruptcy court committed clear error in picking the Boulders appraisal. Accordingly, we find the Boulders plan treats the Pacific claim fairly and equitably paying a blended interest rate of 9% on a debt of $13.3 million.

## CONCLUSION

The debtor Boulders on the River, Inc., restructured the construction loan of the largest secured creditor Pacific First Bank into permanent financing. The plan paid principal and interest on a twenty five year amortization schedule with a balloon due at the end of the seventh year. The plan was proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3) and it treated Pacific's claim fairly and equitably pursuant to 11 U.S.C. § 1129(b)(2)(A). We affirm.

---

5. The court arrived at the 9.035% interest rate using the following figures:
$15,020,000 = FMV of the Boulders property;
$13,300,000 = the outstanding debt on the Pacific Note;
70% = the market loan to value ratio;
8.25% = the market rate of interest;
12% = the interest rate for loans in excess of the 70% loan to value ratio.
The court applied the preceding figures to calculate a blended interest rate:
70% × $15,020,000 = $10,514,000;
$13,300,000 − $10,514,000 = $2,786,000;
$10,514,000 @ 8.25% = $867,405;
$2,786,000 @ 12% = $334,320;
$867,405 + $334,320 = $1,201,725;
$1,201,725 ÷ $13,300,000 = .0903553 or 9.035%.

6. Pacific arrived at the 9.3% interest rate using the following figures:
$13,800,000 = FMV of the Boulders property;
$13,300,000 = the outstanding debt on the Pacific Note;
70% = the market loan to value ratio;
8.25% = the market rate of interest;
12% = the interest rate for loans in excess of the 70% loan to value ratio.
Pacific applied the preceding figures to calculate a blended interest rate:
70% × $13,800,000 = $9,660,000;
$13,300,000 − $9,660,000 = $3,640,000;
$9,660,000 @ 8.25% = $796,950;
$3,640,000 @ 12% = $436,800;
$796,950 + $436,800 = $1,233,750;
$1,233,750 ÷ $13,300,000 = .09276 or 9.3%